POMERANTZ LLP
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Attorneys for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE SLM CORPORATION a/k/a SALLIE MAE SECURITIES LITIGATION _____ THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:25-cv-18834-MCA-JBC <br><br> <u>CLASS ACTION</u> <br><br> FIRST AMENDED CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

1

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ........................................................................1

JURISDICTION AND VENUE ...................................................................7

PARTIES......................................................................................................8

SUBSTANTIVE ALLEGATIONS ............................................................11

    A.    SLM Originates and Services PELs......................................11

    B.    SLM Sells Asset-Backed Securities to Fund PEL Originations .........13

    C.    Witter and Graham's Access to Real-Time Delinquency Data and Trends ..........................................................14

    D.    A Confidential Witness Has Confirmed That, at All Relevant Times, Witter and Graham Had Access to Real-Time Delinquency Data and Trends Via Early-Warning Indicators ..................................................18

    E.    Graham Spoke Knowledgeably Concerning Delinquency Rates and the Factors Affecting Such Rates on SLM's Last Two Earnings Calls Before the Start of the Class Period ....................................................24

    F.    Graham's Materially False and Misleading Statement Concerning SLM's Delinquency Trends .............................................................26

    G.    The Delinquency Misstatement Also Violated Item 303 of SEC Regulation S-K ..............................................................30

    H.    The Truth Comes Out When TD Cowen Reveals That Total Delinquencies Increased in July 2025 At Rates That Far Exceeded Seasonal Norms ..................................................................31

    I.    Plaintiff's Analysis of Data Published on the Data Website Corroborates the Worse-Than-Seasonal Increase in Delinquency Rates in July 2025 ...............................................................33

ADDITIONAL SCIENTER ALLEGATIONS......................................39

    A.    As Substantiated by CW-1, SLM's 2025 Form 10-K, and the LinkedIn Profile of Mr. Ling, When Graham Made the Delinquency Misstatement Both He and Witter Had Contemporaneous Access to Real-Time Data and Trends That Contradicted the Delinquency Misstatement ......................................................39

    B.    Graham Spoke Knowledgeably on Conference Calls Regarding Delinquency Rates and Seasonality, Including Responding to Specific

      Questions From Analysts About Such Rates by Detailing the Factors Influencing Such Rates..................................................................42

C.    Delinquency Rates Were a Core Metric Carefully Monitored Internally at SLM by the Credit Committee and Externally by SLM Investors ...................................................................................43

PRESUMPTION OF RELIANCE...................................................................45

LOSS CAUSATION.......................................................................................46

CLASS ACTION ALLEGATIONS ...............................................................48

COUNT I.........................................................................................................51

COUNT II ........................................................................................................54

COUNT III.......................................................................................................57

COUNT IV.......................................................................................................60

PRAYER FOR RELIEF ..................................................................................61

DEMAND FOR TRIAL BY JURY .................................................................62

Lead Plaintiff Joseph Zappia ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's undersigned attorneys, for Plaintiff's First Amended Class Action Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included among other things, (i) review and analysis of (1) documents filed by SLM Corporation a/k/a Sallie Mae ("SLM" or the "Company") with the United States Securities and Exchange Commission ("SEC"), (2) student loan performance data published by SLM on the Internet, (3) public statements made by Defendants during earnings calls, and (4) analyst reports concerning SLM; and (ii) interviews with confidential witnesses ("CWs") who are former SLM employees. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that invested in SLM securities between July 25, 2025 and August 14, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Defendants .

2.      SLM, more commonly known as Sallie Mae, originates and services private education loans ("PELs") to students. To ensure that SLM is not overstating the value of its loan assets, and that SLM has sufficient reserves to cover expected future loan defaults, applicable accounting standards and regulations require SLM to calculate an allowance for credit losses on a quarterly basis. This allowance appears on SLM's balance sheet, and estimates expected losses from loan defaults over the lifetime of the student loans in SLM's portfolio. Accordingly, a key risk affecting SLM's financial condition is credit risk; that is, the risk that borrowers will default on their student loans.

3.      SLM manages credit risk by continually monitoring various loan portfolio metrics. One of the key metrics monitored is delinquency rates. As explained in the Form 10-K filed by SLM with the SEC on February 19, 2026 ("2025 Form 10-K"): "*[d]elinquencies are an <u>important</u> indicator of the potential future credit performance of our loan portfolio*," and therefore management "*<u>focuses</u> on delinquencies as well as the <u>progression</u> of loans from early to late stage delinquency as a <u>key</u> metric in estimating the allowance for credit losses and tailoring its future collections strategies*."

4. Internally, SLM monitors credit risk such as rising delinquencies through a management-level committee known as the Credit Committee. As per the 2025 Form 10-K, "[c]redit risk exposure is managed *primarily* through the Credit Committee," which manages the "credit risk related to Private Education Loans" via "a credit risk infrastructure that includes . . . *ongoing monitoring and review process of portfolio composition and trends* [and] . . . establishment of an allowance for credit losses that covers estimated future losses based upon an analysis of portfolio metrics and economic factors." Defendant Jonathan W. Witter ("Witter"), SLM's Chief Executive Officer ("CEO"), and Defendant Peter M. Graham ("Graham"), SLM's Chief Financial Officer ("CFO"), were both members of the Credit Committee at all relevant times, and in that capacity, attended Credit Committee meetings, and received credit risk-related materials distributed to Credit Committee members.

5. Among the mechanisms used internally by SLM to monitor delinquency rates in real-time are early-warning indicators that flag emerging delinquency trends falling outside expected ranges. Any such trends are promptly escalated for discussion by the Credit Committee. Accordingly, as Credit Committee members, Witter and Graham both had access to real-time data concerning any emerging delinquency trends that deviated from seasonal norms.

6. Given that delinquency trends are a critical metric for measuring SLM's financial condition and performance, SLM makes its internal delinquency data

3

available to the public on a delayed basis via a website ("Data Website"). Specifically, in the middle of each month, the Data Website is updated with raw delinquency data from the *prior* month such as "30-59 Day Delinquencies as a % of Loans in [Principal & Interest] Repayment," "60-89 Day Delinquencies as a % of Loans in [Principal & Interest] Repayment," and "90+ Day Delinquencies as a % of Loans in [Principal & Interest] Repayment." Investors and analysts can use this data to monitor SLM's financial condition and performance. As discussed below, Plaintiff analyzed this data with the help of a consultant to confirm that SLM's delinquency rates increased between June and July 2025 at rates considerably above seasonal norms.

7. The same data provided on the Data Website on a delayed basis *externally* is *internally* fed into analytical dashboards on a real time basis that senior SLM management, including Graham, Witter, and other members of the Credit Committee, can access to monitor the performance of SLM's loan portfolio, including credit risk within the portfolio based on delinquency trends.

8. The Class Period begins on July 24, 2025, when SLM management held an earnings call to discuss SLM's second quarter ("Q2") 2025 results with analysts. In his prepared remarks, Graham shared information about SLM's delinquency rates. During the Q&A session, an analyst asked Graham about an uptick in early-stage delinquencies in the 30- to 59-day bucket ("Early-Stage Delinquencies"). Graham

4

responded that "the trends that we're seeing in both *delinquencies* as well as sort of the Grace programs and the like, *really are following the* <u>*normal seasonal trends*</u> *that we would expect in the business*." The very next day, a J.P. Morgan analyst that had attended the Q2 2025 call (Richard Shane) published a report stating that a "key takeaway" from the call was that "[d]elinquencies are following normal seasonal expectations." Based on this and other key takeaways from the call, Shane maintained his Overweight rating on SLM's common stock with a price target of $38.00. Similarly, a Morgan Stanley analyst that had attended the Q2 2025 call (Jeffrey Adelson), also published a report the next day stating that "[d]elinquencies and grace programs are following normal seasonal trends," restating Graham's representation nearly verbatim. Based on the Q2 2025 Call, including the Delinquency Misstatement, Adelson maintained his Overweight rating on SLM's common stock with a price target of $40.00 and retained SLM as a Morgan Stanley "Top Pick."

9.     Graham's statement that delinquencies "are following the normal seasonal trends" (the "Delinquency Misstatement"), however, was false and misleading because, in July 2025, the rates for total delinquencies, and Early-Stage Delinquencies, were *not* following "normal seasonal trends." Instead, Plaintiff's analysis of SLM's delinquency data on the Data Website shows that both total delinquencies, and Early-Stage Delinquencies, had increased dramatically from June

5

to July 2025, at rates *far above* "normal seasonal trends" when compared to historical increases in total delinquencies and Early-Stage Delinquencies between June and July in prior years.

10.     Crucially, when he made the Delinquency Misstatement, Graham's membership on the Credit Committee afforded him access to SLM's early-warning monitors, and thus he possessed contemporaneous access to real-time data showing an increase in delinquency rates outside of seasonal norms in July 2025. Thus, when Graham advised the analyst on the Q2 2025 Call that delinquencies—a key metric— "really are following the normal seasonal trends," he knowingly or—at a minimum recklessly—made a public statement about SLM's delinquency trends that was directly contradicted by delinquency data to which he had contemporaneous access as a Credit Committee member showing that delinquencies were considerably *worse* than seasonal norms between June and July 2025.

11.     The truth about SLM's sharply deteriorating delinquency trends in July 2025, emerged after the close of trading on August 14, 2025, when investment bank TD Cowen published a report disclosing that based on SMB Trust data for July 2025, the rise in delinquency rates between June and July 2025 was *worse* than seasonal trends:

> We provide our thoughts on SLM's July 2025 monthly trust data.
>
> Overall, July delinquencies were up 49 bp m/m, ***higher*** (***underline worse***) ***than the seasonal*** (+10 bps) performance for July, driven by a 45 bps

6

increase in early stage delinquencies. Late stage DQs were up 4 bps m/m. As a % of loans in full P&I, DQs rose 64 bps from June (+62 bps from early stage del), ***higher (<u>worse</u>) than the seasonal increase of 17 bps***.[1]

12.     TD Cowen's report—based on SLM's own data—directly contradicted and thus revealed the falsity of Graham's statement on July 24, 2025, that the delinquency rates at that time "*<u>really</u> are following* the *normal seasonal trends*." Investors, not surprisingly, were shocked by the revelation of the truth. Following the issuance of TD Cowen's report, SLM's stock price fell $2.67 per share, or 8.09%, on much higher than normal volume, to close at $30.32 per share on August 15, 2025.

13.     As a result of Graham's false and misleading statement on July 24, 2025 concerning SLM's delinquency trends, and the precipitous decline in the market value of SLM's securities when TD Cowen revealed the truth about those trends on August 14, 2025, Plaintiff and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[1] As "bps," or basis point, is equal to 1/100th of one percent. Thus, a 100 basis point move in a metric would be equal to a 1% move in that metric.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Plaintiff is a resident of this District, and a substantial part of the property that is the subject of this action is thus situated in this District. Moreover, per SLM's most recent quarterly report on Form 10-Q, as of March 31, 2026, there were 188,582,790 shares of common stock outstanding. SLM's common stock trades in the U.S. on the NASDAQ Global Select Market ("NASDAQ") under the ticker "SLM." Accordingly, in addition to Plaintiff, there are presumably hundreds, if not thousands, of investors in SLM's securities located in the U.S., some of whom, like Plaintiff, undoubtedly reside in this District.

17. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

18. Plaintiff, as set forth in his previously filed Certification (Dkt. No. 1), invested in SLM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Plaintiff resides in Middlesex County, New Jersey, which is located in this District.

8

19. Defendant SLM is incorporated in Delaware with principal executive offices located at 300 Continental Drive, Newark, Delaware 19713. The Company's common stock and Series B floating rate non-cumulative preferred stock trade in an efficient market on the NASDAQ under the ticker symbols "SLM" and "SLMBP," respectively. That SLM's stock trades on an efficient market suffices to establish that SLM's options also trade on an efficient market.

20. Defendant Graham served as SLM's CFO, and as a member of SLM's Credit Committee, at all relevant times. On April 27, 2026, SLM announced that it had appointed Graham as a Co-President of the Company.

21. Defendant Witter served as SLM's CEO, a member of SLM's Board of Directors ("Board"), and a member of SLM's Credit Committee at all relevant times.

22. Defendants Witter and Graham are collectively referred to herein as the "Individual Defendants," and together with SLM, the "Defendants."

23. Graham possessed the power and authority to control, and did control, the contents of SLM's SEC filings, press releases and other public statements. In particular, Graham personally made statements to analysts and investors on SLM's quarterly earnings calls concerning SLM's financial condition and performance, including delinquency rates. Because of his position within SLM (including without limitation, his position as CFO, and his membership on the Credit Committee), Graham had contemporaneous access to non-public real-time data showing that

9

SLM's delinquency rates were rising at rates far worse than seasonal norms during July 2025, which directly contradicted the Delinquency Misstatement made by Graham on July 24, 2025, on the Q2 2025 earnings call ("Q2 2025 Call"). Accordingly, Graham is liable for making a false and misleading statement during the Class Period.

24. Witter likewise possessed the power and authority to control, and did control, the contents of SLM's SEC filings, press releases and other public statements, including statements made on SLM's quarterly earnings calls. As SLM's CEO, Witter co-hosted the Q2 2025 Call with Graham, during which the Delinquency Misstatement was made. Although Graham responded on behalf of Defendants to the analyst's question concerning delinquency rates, Witter was present on the call when the Delinquency Misstatement was made, and failed to correct it, despite the fact that by virtue of his (i) position as CEO, he had authority over Graham, and (ii) membership on the Credit Committee, he had contemporaneous access to non-public real-time data showing that SLM's delinquency rates were rising at rates far worse than seasonal norms during July 2025, which directly contradicted the Delinquency Misstatement made by Graham on July 24, 2025, on the Q2 2025 Call. Accordingly, Witter is also liable for the Delinquency Misstatement.

10

25.     SLM, in turn, is liable for the Delinquency Misstatement made by Graham, and Witter's failure to correct the Delinquency Misstatement, under the doctrine of *respondeat superior* and common law principles of agency because all wrongful acts alleged herein were carried out by Graham and Witter within the scope of their employment, and/or agency with the authority or apparent authority to do so. Graham's and Witter's scienter is therefore imputable to SLM.

## SUBSTANTIVE ALLEGATIONS

### A.     SLM Originates and Services PELs

26.     SLM originates and services PELs, which are education loans that are not made, insured, or guaranteed by any state or federal government. SLM's PELs bridge the gap between tuition costs, and other sources of funding available to students to pay such costs, including personal and family income and savings, scholarships and grants, and federal financial aid.

27.     SLM's primary PEL product is the Smart Option Student Loan, which offers three repayment options at the time of loan origination. The first two options—interest only and fixed payment options—permit reduced monthly payments while the borrower is in school and during a grace period thereafter. The third repayment option is a deferred product where borrowers are not required to make any payments while in school and during a grace period after separating from

11

a school (because of graduation or other reasons) that typically runs for 6 to 36 months.

28.     PELs in repayment include loans on which borrowers are making interest only or fixed payments, as well as loans that have entered full principal and interest ("P&I") repayment status after any applicable grace period.

29.     In its financial statements, SLM divides loans in repayment into four buckets: (i) loans current; (ii) loans delinquent 30-59 days; (iii) loans delinquent 60-89 days; and (iv) loans 90 days or greater past due. The first delinquency bucket (30-59 days) are often referred to as early-stage delinquencies, while the latter two buckets are referred to as later-stage delinquencies.[2]

30.     As further discussed below, SLM's delinquency rates are key indicators of the future performance of SLM's PEL portfolio. Accordingly, SLM management closely monitors the progression of loans through the stages of delinquency identified above. The mechanisms by which Witter, Graham and other SLM executives monitor SLM's delinquency rates in real-time are discussed in Sections C and D below.

---

[2] In its records, SLM considers a PEL to be delinquent if the borrower has not made a required payment before the 31st day after such payment was contractually due.

Loans in "forbearance" fall into a separate bucket. Forbearance allows a borrower to not make any scheduled payments for a specified period of time if certain hardship or other criteria are met.

### B.      SLM Sells Asset-Backed Securities to Fund PEL Originations

31.     SLM's PELs are originated by its wholly-owned subsidiary, Sallie Mae Bank ("SM Bank"). To collect funds for PEL originations, SM Bank offers traditional savings products, such as high-yield savings accounts, money market accounts, and certificates of deposit. Like any bank, the funds provided by such deposits are then used by SM Bank to originate PELs.

32.     To avoid excessive reliance on deposit funding, SM Bank also obtains funding to originate PELs from the sale of long-term asset-backed securities ("ABS") collateralized by pools of PELs.

33.     The ABS program has four primary steps:

**Step 1: Loan Origination**: SLM issues PELs to students.

**Step 2: Transfer to a Trust**: SLM bundles thousands of PELs and sells them to bankruptcy-remote trusts referred to as SMB Private Education Loan Trusts ("SMB Trusts"). This legal separation protects investors from any future corporate credit issues that might affect SLM.

**Step 3: Bond Issuance**: Each SMB Trust issues different classes of bonds (known as "tranches") with different ratings (typically AAA to B) to investors in the capital markets. These tranches carry varying levels of risk and return.

13

**Step 4: Repayment Flow**: As borrowers make payments on their student loans, the SMB Trust uses the incoming cash flow to pay interest and return principal to ABS investors.

34. The process of bundling cash flow-producing assets like student loans into pools, creating separate legal entities to house the asset pools, and selling tradeable securities collateralized by the asset pools to investors, is referred to as structured financing.

35. According to data SLM published on the Data Website, the aggregate size of the original pools for the 36 SMB Trusts formed between August 7, 2014 and May 7, 2025 is $32.4 billion (which includes loan principal and capitalized interest).[3]

**C. Witter and Graham's Access to Real-Time Delinquency Data and Trends**

36. SLM's Data Website provides investors and analysts with monthly reports in PDF format known as Service and Distribution Reports ("Monthly Reports") concerning each of the SMB Trusts:

https://www.salliemae.com/investors/asset-backed-securities/

---

[3] Plaintiff's analysis of the data on the Data Website discussed below in Section I used data from the 36 SMB Trusts formed between August 7, 2014 and May 7, 2025, because the SMB Trusts that closed after May 7, 2025, did not generate separate monthly performance data for June and July 2025, which is the month-over-month timeframe relevant to the Delinquency Misstatement.

14

37.    The Monthly Reports provide data for each SMB Trust on a *delayed basis*; that is, for the month *preceding* the month during which the data is published. The data published includes pool balance (i.e., principal plus capitalized interest), number of loans, number of borrowers, repayments of principal and interest, repayment stage, and borrower FICO scores. For example, the Monthly Servicing Report for the SMB Private Education Loan Trust 2025-A for the collection period running 07/01/25–07/31/25, was distributed on August 15, 2025, and made available at the following URL:

https://www.salliemae.com/content/dam/slm/writtencontent/Reports/investors/august-2025/DistRpt25-A_20250815.pdf

38.    All of the Monthly Reports since inception for the SMB Private Education Loan Trust 2025-A, as well as other details concerning such Trust (including issuance details and current interest rates) are available at:

https://www.salliemae.com/investors/asset-backed-securities/smb/2025-a/

39.    The same Reports are available on the Data Website for all of SLM's other SMB Trusts.

40.    The homepage of the Data Website also provides access to Excel spreadsheets displaying historical monthly performance data for each SMB Trust on a delayed basis. For example, at rows 366-499, the "Performance" tab of the spreadsheet named "SMB Private Education Loan ABS Trusts Static Pool

15

Information and Monthly Performance Data" displays "30-59 Day Delinquencies as a % of Loans in P&I Repayment," "60-89 Day Delinquencies as a % of Loans in P&I Repayment," and "90+ Day Delinquencies as a % of Loans in P&I Repayment" on a monthly basis since the inception of each SMB Trust.

41.   Unlike investors and analysts, Witter, Graham and other SLM executives have had ready access at all relevant times to dynamic analytical tools providing real-time insight into emerging delinquency trends long before the underlying delinquency data is published to the Data Website. According to the properties of the "SMB Private Education Loan ABS Trusts Static Pool Information and Monthly Performance Data" spreadsheet on the Data Website, its author is Mariella Calderon. According to her LinkedIn profile, Ms. Calderon is a Senior Associate Analyst at SM Bank. An organizational chart for SLM available at the TheOrg.com shows that Ms. Calderon reports to Katie Drosky Gecan (Director, Structured Finance) who reports to Justin Li (Senior Director, Structured Finance) who reports to Graham who reports to Witter.

42.   Another spreadsheet available on the homepage of the Data Website is a spreadsheet named "Smart Option Student Loan Historical Performance Data," which displays delinquency rates, default rates, and other performance data. According to the spreadsheet's properties, the author of the spreadsheet is Juston Ling, and the spreadsheet was last modified by Ms. Calderon.

16

43.    According to his LinkedIn profile, Mr. Ling is a Senior Director of Portfolio Analytics and Reporting at SLM. Upon information and belief, Mr. Ling reports to Mark Stueve (Vice President, Credit Strategies and Portfolio Analytics) who reports to Munish Pahwa (Chief Risk Officer) who sits on the Credit Committee with Graham and Witter.

44.    According to Mr. Ling's LinkedIn profile, his team makes data concerning trends and other performance metrics available to upper management and the board of directors on a "dynamic" (i.e., real-time) basis to enable effective monitoring of risk within SLM's loan portfolio:

> At Sallie Mae, our team's dedication to portfolio-level analytics and reporting has been pivotal in enhancing strategic decision-making. We specialize in harnessing the power of Big Data, SAS, SQL, and Power BI to deliver comprehensive insights, thereby supporting the company's objectives. ***Our dynamic dashboards and analytical packages are crucial tools for upper management and the board of directors, enabling a deeper understanding of our student loan portfolio's performance***.
>
> ***Since assuming the Senior Director role, my focus has been on identifying and monitoring risk within the portfolio, using trend analysis to pinpoint underperforming segments***. This approach has not only optimized our credit analytics but also cultivated a culture that prioritizes data-driven strategies. The collaboration with my team has been instrumental, leading to the development of standardized reporting that is integral to Sallie Mae's market leadership.[4]

---

[4] Providing "dynamic" access to data means providing access to information in real-time based on changing variables. *See, e.g.*, https://www.secoda.co/glossary/what-are-dynamic-data-access-policies ("*Dynamic* data access policies are essential frameworks that govern how data is accessed, ensuring that only authorized users can view or manipulate sensitive information. These policies adapt based on *real-*

17

45.     The foregoing public sources substantiate the chain within SLM by which internal delinquency data collected by employees such as Ling and Calderon is fed into "dynamic dashboards and analytical packages" that enable SLM senior executives like Witter and Graham to monitor risk within SLM's loan portfolio on a *real-time* basis. As set forth in Section D, a former SLM employee corroborated that Witter and Graham have access to real-time delinquency data and trends made available to Credit Committee members. Thus, on July 24, 2025, when Graham made the Delinquency Misstatement on the Q2 2025 call, only he and Witter knew the truth about the worse-than-seasonal increase in delinquency rates between June and July 2025. Investors and analysts could not have discerned those trends on their own because SLM did not make its July 2025 delinquency data publicly available until mid-August 2025.

> **D.     A Confidential Witness Has Confirmed That, at All Relevant Times, Witter and Graham Had Access to Real-Time Delinquency Data and Trends Via Early-Warning Indicators**

46.     The allowance for credit losses entry on a bank balance sheet represents

---

*time conditions*, such as user roles, locations, and the sensitivity of the data."). With respect to other jargon appearing in Mr. Ling's profile: Big Data refers to datasets that are too large, complex, and rapidly growing to be processed and analyzed by standard databases; SAS is a company that sells software optimized for data management and analytics; SQL is a language used to query large datasets; and Power BI is an analytics tool developed by Microsoft that lets users visualize and analyze large datasets.

that portion of the total outstanding loans held by a bank as assets that the bank estimates will never be repaid. To ensure that SLM is not overstating the value of its loan assets, and that SLM has sufficient reserves to cover expected future loan defaults, applicable accounting standards and regulations require SLM to estimate an allowance for credit losses at least quarterly.[5]

47.    Each quarter, SLM determines its allowance for credit losses by estimating expected losses from defaults over the lifetime of the student loans in its portfolio. Accordingly, a key risk affecting SLM's financial condition is credit risk; that is, the risk that borrowers will default on their student loans.

48.    SLM manages credit risk by continually monitoring loan portfolio trends, especially delinquency rates. As per SLM's 2025 Form 10-K: "*[d]elinquencies are an important indicator of the potential future credit performance of our loan portfolio*," and therefore management "*focuses on delinquencies as well as the progression of loans from early to late stage delinquency as a key metric in estimating the allowance for credit losses*..." In particular, management reviews "delinquency percentages" when determining the

---

[5] While the allowance for credit losses appears on the balance sheet, quarterly adjustments to the allowance affects a bank's income statement: adjustments downward increase net income while adjustments upward are recorded as a provision expense that reduces net income. Thereafter, as they occur, actual loan charge-offs reduce the allowance for credit losses rather than reducing earnings. SLM's PELs are charged off at the end of the month in which they reach 120 days delinquent

adequacy of credit loss allowances. Among the percentages reviewed are delinquencies as a percentage of loans in repayment."

49.    As part of SLM's risk management framework, the Board formed a Financial Risk Committee with oversight responsibility as to SLM's major financial risks, including credit risk.

50.    At the management-level, there is an Executive Committee that is charged with assisting Witter with the general supervision of SLM's business. The Executive Committee formed a management-level sub-committee known as the Credit Committee, which is primarily responsible for, among other things, ongoing monitoring of credit risks, including delinquency rates. As per the 2025 Form 10-K, "***[c]redit risk exposure is managed <u>primarily</u> through the Credit Committee***," which manages the "credit risk related to Private Education Loans" via "a credit risk infrastructure that includes . . . ***<u>ongoing monitoring and review process of portfolio composition and trends</u>*** [and] . . . establishment of an allowance for credit losses that covers estimated future losses based upon an analysis of portfolio metrics and economic factors."

51.    Details concerning the mechanisms by which the Credit Committee monitors credit risk, including deteriorating delinquency rates, were confirmed by Confidential Witness 1 ("CW-1"). CW-1 worked in SLM's corporate legal department as a corporate governance and compliance manager from June 2015 to

May 2025, including as a senior corporate governance manager and assistant secretary from February 2024 to May 2025, when CW-1 reported to Rick Nelson, SLM's Senior Vice President, Chief Regulatory Counsel and Corporate Secretary.

52.     In CW-1's role as a senior corporate governance manager and assistant secretary, CW-1 administered SLM's corporate governance platform, Nasdaq Boardvantage. Through the Boardvantage platform, CW-1 prepared and assembled the documents to be reviewed at Board and Board-level committee meetings, and distributed such documents to the scheduled attendees in advance of such meetings. After such meetings concluded, CW-1 reviewed the minutes and other meeting records to confirm attendance and the topics discussed at such meetings.

53.     Through the Boardvantage platform, CW-1 also managed and reviewed the minutes and other records for management-level committee meetings, including Credit Committee meetings, to confirm attendance and the topics discussed at such meetings, and the materials accessed in advance of such meetings.

54.     As an administrator of SLM's Boardvantage platform, CW-1 was able to use logs with date- and time-stamped entries to monitor the distribution and accessing of documents stored on the platform in advance of Credit Committee meetings. Thus, CW-1 had full visibility into which executives accessed what documents and when, including activity by both Witter and Graham. The date-and

21

time-stamped entries also reflected who spoke at Credit Committee meetings and what topics were discussed at such meetings.

55.    Thus, based on CW-1's role and level of access, CW-1 was familiar with: (i) the membership of the Credit Committee, (ii) the contents of the materials distributed to Credit Committee members in advance of Credit Committee meetings; (iii) the contents of reports prepared by the Credit Committee for escalation to and review by the Board, (iv) attendance at Credit Committee meetings, and (v) the topics discussed at Credit Committee meetings. Based on such familiarity, CW-1 advised that: (i) SLM has a culture of closely monitoring credit performance trends, and (ii) increases in delinquency rates drew heightened attention from SLM's senior executives. CW-1 further advised that: (i) materials distributed in advance of Credit Committee meetings consistently included delinquency reports with data, narratives, graphs, and other analytical materials addressing delinquency trends, and seasonality-related delinquency information; (ii) delinquency trends including seasonality were a recurring topic discussed at Credit Committee meetings; and (iii) through such materials and meetings, Witter and Graham could and did closely track delinquency trends, as further described below.

56.    *First*, CW-1 advised that both Witter and Graham: (i) were designated members of the Credit Committee under the Credit Committee's charter; (ii) appeared on the distribution list for materials circulated via the Boardvantage

22

platform in advance of Credit Committee meetings; (iii) regularly accessed delinquency-related materials on the Boardvantage platform; and (iv) attended and participated in Credit Committee meetings. CW-1 noted that Graham in particular focused on delinquency rates because of the impact on earnings. *See* footnote 5 above.

57.    *Second*, CW-1 advised that because delinquency performance is a major focus for SLM (as corroborated by the 2025 Form 10-K; *see supra*), there are mechanisms in place to detect in real-time any movement in delinquency rates outside expected ranges such as seasonal norms, and promptly escalate such deviations for discussion by the Credit Committee. Specifically, any emerging delinquency trends developing during a particular month outside expected ranges is flagged by color-coded early-warning indicators, and escalated for discussion by the Credit Committee.

58.    *Third*, CW-1 advised that early-warning indicators tied to delinquency trends, e.g., rising delinquency rates, were highlighted in materials circulated in advance of Credit Committee meetings, and delinquency performance outside expected ranges was discussed during Credit Committee meetings. Thus, as Credit Committee members, both Witter and Graham had access to real-time data concerning any emerging delinquency trends deviating from expected ranges such as seasonal norms.

59. CW-1's description of the mechanisms that Defendants use to monitor credit risk, including delinquency trends, was corroborated in part by CW-2. CW-2 worked as the Director of Collections and Vendor Management from June 2019 to February 2025, and reported to Vice President and Head of Collections, Joe Hammond. In that role, CW-2 oversaw early-stage collections and supervised a call-center team responsible for contacting borrowers in the earliest stages of delinquency.

60. CW-2 stated that delinquency data, including from the 30-, 60- and 90-day buckets, was delivered through Power BI dashboards to SLM senior leadership, including Witter and Graham. CW-2 also mentioned that senior management could use Salesforce (a software application used to manage large datasets) to monitor delinquency trends on a real-time basis over the course of a month.

**E.    Graham Spoke Knowledgeably Concerning
Delinquency Rates and the Factors Affecting Such Rates
on SLM's Last Two Earnings Calls Before the Start of
<u>the Class Period</u>**

61. As detailed above, delinquency rates are a key performance metric for SLM. Thus, not surprisingly, Graham addressed delinquency rates on SLM's last two earnings calls before the start of the Class Period during his prepared remarks, and during Q&A sessions with Wall Street analysts covering SLM. Indeed, Graham consistently presented himself as intimately familiar with SLM's delinquency data, and the factors influencing delinquency trends, including seasonality.

24

62.     For example, on January 23, 2025, during his prepared remarks on SLM's Q4 2024 earnings call ("Q4 2024 Call"), Graham reported that "Private Education Loans delinquent 30 day or more were 3.7% of loans [in] repayment as of December 31, 2024, an increase from 3.6% at the end of the third quarter, but a decrease from 3.9% at the end of 2023." Graham attributed "this slight uptick in delinquencies from the third quarter" as being "*primarily driven by seasonality*, as well as marginally impacted by continued refinements to the eligibility of our loan modification offerings."[6]

63.     On April 24, 2025, during his prepared remarks on SLM's Q1 2025 earnings call ("Q1 2025 Call"), Graham reported that "[p]rivate education loans delinquent 30 days or more were 3.6% of loans in repayment, a decrease from 3.7% at the end of 2024, although higher than the 3.4% at the end of the year ago quarter."

64.     During the Q&A session, a Barclays Bank analyst, Terry Ma, asked about the uptick in early-stage delinquencies:

> [T]he delinquency rate improved sequentially, but it was up 18 basis points year-over-year. A lot of that was driven by the early stage bucket. That bucket was pretty flat year-over-year the last two quarters. So, any color on kind of what went on there?

65.     Graham responded:

> *I think one of the things that's sort of impacting delinquencies in the quarter is sort of the impact of the folks that are in their qualifying*

---

[6] As shown by Graham's comments, "seasonality" refers to special factors affecting loan performance during specific quarters.

*periods in the mod programs and comparing prior first quarter to this quarter, that's a significant change in practice*. If you adjust for those folks in the mod programs that are in the delinquency buckets that number for this quarter is a 3% number. So, I think that's a big piece of some of the trend that you're referring to there.

**F.     Graham's Materially False and Misleading Statement Concerning SLM's Delinquency Trends**

66.     The Class Period begins on July 24, 2025, when SLM issued a press release announcing its financial results for Q2 2025.  Later that day, SLM hosted the Q2 2025 Call with analysts to discuss its Q2 2025 financial results. Both Graham and Witter participated in the Q2 2025 Call on behalf of SLM, with each making prepared remarks and each being available to answer analyst questions during the Q&A session.

67.     During his prepared remarks, Graham again spoke knowledgeably about loan delinquency rates, demonstrating his intimate familiarity with the subject, and his recognition that delinquency rates are material to SLM investors and Wall Street analysts:

> Private education loans *delinquent 30 days or more* were 3.5% of loans in repayment, a decrease from the 3.6% at the end of the first quarter of 2025, although higher than the 3.3% at the end of the year ago quarter. We remain pleased with the continued positive performance of our loan modification programs and *see the benefit of these programs within our late-stage delinquencies*, which have remained flat year-over-year despite an almost $2 billion increase in loans in repayment.

68.     Graham also spoke knowledgeably concerning "seasonal" changes in the credit performance of SLM's loan portfolio between the first and second quarter:

26

[W]hen looking at the credit performance of the portfolio, the second quarter demonstrated solid credit quality, *consistent* with our *seasonal* expectations.

69.    During the Q&A sessions, Barclays Bank analyst Terry Ma asked Graham and Witter to provide "color" on (i) the performance of borrowers as they exit "grace" programs, and (ii) "the 30- to 59-day delinquency bucket that is kind of up meaningfully year-over-year." Graham responded by attributing the change in delinquency rates to "normal seasonal trends:"

> I think in general, ***I would say the <u>trends</u> that we're seeing in both <u>delinquencies</u> as well as sort of the Grace programs and the like, <u>really are following the normal seasonal trends</u> that we would expect in the business***. We continue to be pleased with the performance of the loan mod programs and success rates there. We have not seen any sort of abnormal trends of increased pressure on folks as they come out of the extended grace program. So variations that we're seeing were starting to sort of settle into what we think is going to be kind of our new kind of normal in terms of seasonality.

70.    Witter was present on the Q2 2025 Call when Graham made the foregoing Delinquency Misstatement, and did not correct or qualify it in any way.

71.    The market impact of the Delinquency Misstatement was immediate and concrete. For example, Richard Shane, the J.P. Morgan analyst who attended the Q2 2025 Call, published a report concerning SLM the very next day (the "J.P. Morgan July 25 Report"). In the report, Shane characterized the Delinquency Misstatement as one of the "Key Takeaways" from the call, noting that "*[d]elinquencies are following normal seasonal expectations*, with loan mods

27

performing well." Based on Graham's representations, including the Delinquency Misstatement, Shane modestly improved his net charge-off rate estimate for SLM's in-repayment private education loan portfolio and maintained his Overweight rating on SLM's common stock with a price target of $38.00. The J.P. Morgan July 25 Report thus demonstrates that the Delinquency Misstatement was received, understood, and relied upon by the analyst community as a material and accurate statement about the state of SLM's delinquency trends—precisely as a reasonable investor would have understood it.

72.    Jeffrey Adelson, the Morgan Stanley analyst who also attended the Q2 2025 Call, likewise published a report the very next day. In that report, Adelson recorded Graham's representation as a factual statement about SLM's credit performance, writing that "[d]elinquencies and grace programs are following normal seasonal trends," paraphrasing the Delinquency Misstatement nearly verbatim. Based on the Q2 2025 call, including the Delinquency Misstatement, Adelson maintained his Overweight rating on SLM's common stock with a price target of $40.00 and retained SLM as a Morgan Stanley "Top Pick." That Morgan Stanley simultaneously and independently received and transmitted the Delinquency Misstatement in the same terms as J.P. Morgan confirms that the misstatement was received by the analyst community as a clear, material, and unambiguous representation about SLM's delinquency trends.

73.    Graham's statement, however, that delinquencies "are following the normal seasonal trends," was false and misleading because between June and July 2025, the rates for total delinquencies *and* Early-Stage Delinquencies did *not* follow "normal seasonal trends." To the contrary, as TD Cowen subsequently reported (Section H below), total delinquencies had increased dramatically from June to July 2025, at rates well-above "normal seasonal trends" when compared to historical increases in total delinquencies between June and July in prior years. Plaintiff's analysis of the data on the Data Website (which, as explained, was not available at the time the Delinquency Misstatement was made) reproduced TD Cowen's results, and also showed that Early-Stage Delinquencies had likewise increased dramatically from June to July 2025, at rates well-above "normal seasonal trends" when compared to historical increases in Early-Stage Delinquencies between June and July in prior years. *See* Section I below.

74.    As members of the Credit Committee with access to early-warning indicators and other dynamic analytical tools, both Graham and Witter had contemporaneous access to real-time delinquency data during July 2025. Thus, Graham knowingly made a public statement about SLM's delinquency trends that was directly contradicted by real-time delinquency data to which he had contemporaneous access when he made the statement. Regardless, if Graham had *not* reviewed SLM's delinquency trends in July 2025 as of July 24, 2025, and thus

29

did not have any basis for the Delinquency Misstatement, then his making of the Delinquency Misstatement constituted recklessness.

75.    Witter was present on the call when Graham made the Delinquency Misstatement, and had authority over Graham. Yet, despite knowing—or at a minimum, recklessly disregarding—that the Delinquency Misstatement was directly contradicted by real-time delinquency data to which he had contemporaneous access, Witter failed to correct the Delinquency Misstatement. Thus, Witter is also liable for the Delinquency Misstatement.

### G.    The Delinquency Misstatement Also Violated Item 303 of SEC Regulation S-K

76.    The Delinquency Misstatement also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required SLM to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Under Item 303, Defendants should have disclosed that total delinquencies and Early-Stage Delinquencies had increased from June to July 2025 at well-above normal seasonal trends, given that such a material increase in delinquency rates would have an unfavorable impact on SLM's financial results due to the use of delinquency rates to determine quarterly credit loss allowances (which flow through to the income statement, as explained in footnote 5 above).  Instead, Graham made the materially misleading statement that

30

"delinquencies . . . *really are* following the *normal seasonal trends*," which was false and misleading because total delinquencies and Early-Stage Delinquencies had increased between June and July 2025, at rates that were much worse than historical trends for that timeframe. *See* Section I *infra*.

**H.    The Truth Comes Out When TD Cowen Reveals That Total Delinquencies Increased in July 2025 At Rates That Far Exceeded Seasonal Norms**

77.    On August 14, 2025, after the close of trading, TD Cowen issued a report ("TD Cowen August 14 Report"), flagging a considerably worse-than-seasonal increase in total delinquencies for SLM's PELs in July 2025, which directly contradicted the Delinquency Misstatement. The TD Cowen August 14 Report stated:

We provide our thoughts on SLM's July 2025 monthly trust data.

Overall, July delinquencies were up 49 bp m/m, higher (*worse*) than the seasonal (+10 bps) performance for July, ***driven by a 45 bps increase in early stage delinquencies***. Late stage DQs were up 4 bps m/m. ***As a % of loans in full P&I***, DQs rose 64 bps from June ***(+62 bps from early stage del), higher (worse) than the seasonal increase of 17 bps***. Trust balances were down 1.3% m/m; this likely pushed delinquencies up somewhat compared to total portfolio by 5 bps or so. We will know by next month whether the early stage DQs roll or not.

**DQs**: July trust DQs ***as a % of total loans*** were 4.38% vs last month's 3.89%, last year's 3.60% and pre-pandemic June 2019's 2.41%. July DQ rate is up 49 bps m/m (***worse than historical 10 bps m/m increase in July***) and up 78 bps y/y. ***DQ decrease driven by early stage (+45 bps m/m)***. July DQs ***as a % of loans in full P&I*** were 6.23% vs last month's 5.60% & prior year's 5.28% and June 2019's 3.95%. July was up 95

31

bps y/y and ***up 64 bps m/m vs historical increase of 17 bps***. ***Late stage delinquencies in full P&I were up 2 bps m/m***.

78.     Thus, the TD Cowen August 14 Report revealed that, as a percentage of total loans (regardless of repayment status), total delinquencies were up 49 basis points, or bps, in July 2025, which was *worse* than the historical seasonal increase in total delinquencies as a percentage of total loans of 10 bps in July. Additionally, as a percentage of loans in full repayment (i.e., principal and interest), total delinquencies rose 64 bps in July 2025, which was *worse* than the historical seasonal increase in total delinquencies as a percentage of loans in full repayment of 17 bps in July.

79.     TD Cowen's findings directly contradicted Graham's Delinquency Misstatement that delinquencies "really are following the *normal seasonal trends*." Given Graham's emphatic assurance to analysts and investors regarding delinquency rates, the TD Cowen August 14 Report shocked investors. As a direct result, SLM's stock price fell $2.67 per share, or 8.09%, to close at $30.32 per share on August 15, 2025, resulting in a drop in market capitalization of approximately $557 million based on 208,481,380 shares of common stock outstanding as of June 30, 2025. The steep drop was accompanied by a sharp increase in trading volume to 6,785,018 shares (as compared to volume of 1,198,103 shares on August 14, 2025).

**I.    Plaintiff's Analysis of Data Published on the Data Website Corroborates the Worse-Than-Seasonal Increase in Delinquency Rates in July 2025**

80.    Plaintiff analyzed the data published by SLM on the Data Website with the assistance of a consultant with over fifteen years of experience using Excel spreadsheets and other applications to analyze large datasets and build complex financial models (including for consumer lending institutions). Using the data on the Data Website, Plaintiff's analysis (i) reproduced the findings in the TD Cowen report regarding the worse-than-seasonal increases in total delinquencies in July 2025, and (ii) showed that the rate of Early-Stage Delinquencies in July 2025, also sharply exceeded seasonal norms.

**Delinquencies as a Percentage of Total Loans Outstanding**

81.    Plaintiff's analysis of the data on the Data Website calculated that: (i) total delinquencies as a percentage of total loans outstanding (without regard to repayment status) increased by 48 bps from June to July 2025 (which is virtually identical to the 49 bps increase that TD Cowen reported); (ii) Early-Stage Delinquencies as a percentage of total loans increased 44 bps from June to July 2025 (which is virtually identical to the 45 bps increase that TD Cowen reported); and (iii) later stage delinquencies (i.e., 60 days or more) as a percentage of total loans rose 4 bps from June to July 2025 (which is identical to the 4 bps increase that TD Cowen reported).  Thus, Plaintiff's analysis of the data on the Data Website reproduced TD

33

Cowen's findings with respect to rates of increase in July 2025 in total delinquencies and Early-Stage Delinquencies as a percentage of total loans.

82.     In terms of seasonal trends, TD Cowen did not disclose the timeframe it used to compute the historical seasonal trend of a 10 bps increase in total delinquencies as a percentage of total loans from June to July, to compare to the 49 bps increase reported by TD Cowen for the same metric between June and July 2025. Accordingly, Plaintiff computed averages across different time periods and found the following:

| June to July Month-to-Month Average Increases in Delinquencies as a Percentage of Total Loans (based on Plaintiff's analysis of data on Data Website) | |
|---|---|
| **Interval** | **Average Increase** |
| 2015-2024 | 11 bps |
| 2017-2024 | 12 bps |
| 2018-2024 | 11 bps |
| 2019-2024 | 14 bps |

83.     Based on the above table, the 48 bps increase in total delinquencies as a percentage of total loans from June to July 2025, derived by Plaintiff, is well-above

the average increase in that metric from June to July across multiple timeframes. The increase of 48 bps from June to July 2025 was also considerably higher than the five highest increases in total delinquencies as a percentage of total loans from June to July during the 2015 to 2024 timeframe:

- June to July 2022 (35 bps increase)

- June to July 2021 (20 bps increase)

- June to July 2017 (17 bps increase)

- June to July 2020 and June to July 2024 (14 bps increase)

84.    Finally, Plaintiff calculated Early-Stage Delinquencies as a percentage of total loans from June to July during the 2015 and 2024 timeframe, and found that the calculated 44 bps increase in Early-Stage Delinquencies as a percentage of total loans from June to July 2025 was considerably higher than the five highest increases in Early-Stage Delinquencies as a percentage of total loans from June to July during the 2015 to 2024 timeframe:

- June to July 2024 (30 bps increase)

- June to July 2022 (18 bps increase)

- June to July 2021 (15 bps increase)

- June to July 2017 and June to July 2020 (14 bps increase).

85.    In sum, based on the data on the Data Website, the increase of 48 bps in total delinquencies as a percentage of total loans from June to July 2025 (derived

by Plaintiff), as well as the increase of 44 bps in Early-Stage Delinquencies as a percentage of total loans from June to July 2025 (derived by Plaintiff), were considerably worse than historical seasonal increases in those metrics from June to July in prior years. Thus, data and trends to which Graham and Witter had access on a real-time basis when the Delinquency Misstatement was made show that trends in July 2025 with respect to both total delinquencies and Early-Stage Delinquencies as a percentage of total loans were *not* following normal seasonal trends.

**Delinquencies as a Percentage of Loans in Full Repayment (P&I)**

86.     Plaintiff's analysis of the data on the Data Website calculated that: (i) total delinquencies as a percentage of loans in full repayment (i.e., principal and interest) increased by 65 bps from June to July 2025 (which is virtually identical to the 64 bps increase TD Cowen reported); (ii) Early-Stage Delinquencies as a percentage of loans in full repayment increased 63 bps from June to July 2025 (which is virtually identical to the 62 bps increase TD Cowen reported ); and (iii) later stage delinquencies (i.e., 60 days or more) as a percentage of loans in full repayment rose 2 bps from June to July 2025 (which is identical to the 2 bps increase TD Cowen reported ). Thus, Plaintiff's analysis of the data on the Data Website reproduced TD Cowen's findings with respect to rates of increase in July 2025 in total delinquencies and Early-Stage Delinquencies as a percentage of loans in full repayment.

36

87.     In terms of seasonal trends, TD Cowen did not disclose the timeframe it used to compute the historical seasonal trend of a 17 bps increase in total delinquencies as a percentage of loans in full repayment from June to July, to compare to the 64 bps increase reported by TD Cowen for the same metric between June and July 2025. Accordingly, Plaintiff computed averages across different time periods and found the following:

| June to July Month-to-Month Average Increases in Delinquencies as a Percentage of Loans in Full Repayment (based on Plaintiff's analysis of data on Data Website) | |
| --- | --- |
| Interval | Average Increase |
| 2015-2024 | 15 bps |
| 2017-2024 | 19 bps |
| 2018-2024 | 18 bps |
| 2019-2024 | 21 bps |

88.     Based on the above table, the 65 bps increase in total delinquencies as a percentage of loans in full repayment from June 2025 to July 2025, derived by Plaintiff, is well-above the average increase from June to July across multiple timeframes. The increase of 65 bps from June to July 2025 was also considerably

37

higher than the five highest increases in total delinquencies as a percentage of loans in full repayment from June to July during the 2015 to 2024 timeframe:

- June to July 2022 (43 bps increase)

- June to July 2024 (36 bps increase)

- June to July 2021 (29 bps increase)

- June to July 2017 (21 bps increase)

- June to July 2020 (12 bps increase).

89.    Finally, Plaintiff calculated Early-Stage Delinquencies as a percentage of loans in full repayment from June to July during the 2015 and 2024 timeframe, and found that the calculated 63 bps increase in Early-Stage Delinquencies as a percentage of loans in full repayment from June to July 2025 was considerably higher than the five highest increases in Early-Stage Delinquencies as a percentage of loans in full repayment from June to July during the 2015 to 2024 timeframe:

- June to July 2024 (55 bps increase)

- June to July 2022 and June to July 2021 (22 bps increase)

- June to July 2017 (21 bps increase)

- June to July 2020 (18 bps increase)

90.    In sum, based on the data on the Data Website, the increase of 65 bps in total delinquencies as a percentage of loans in full repayment from June to July 2025 (derived by Plaintiff), as well as the increase of 63 bps in Early-Stage

Delinquencies as a percentage of loans in repayment from June to July 2025 (derived by Plaintiff), were considerably worse than historical seasonal increases in those metrics from June to July in prior years. Thus, data and trends to which Graham and Witter had access on a real-time basis when the Delinquency Misstatement was made show that trends in July 2025 with respect to total delinquencies and Early-Stage Delinquencies as a percentage of loans in full repayment were *not* following normal seasonal trends.

**ADDITIONAL SCIENTER ALLEGATIONS**

**A.    As Substantiated by CW-1, SLM's 2025 Form 10-K, and the LinkedIn Profile of Mr. Ling, When Graham Made the Delinquency Misstatement Both He and Witter Had Contemporaneous Access to Real-Time Data and Trends That Contradicted the Delinquency Misstatement**

91.    Graham made the Delinquency Misstatement with scienter—and Witter failed to correct Graham with scienter—because when the Delinquency Misstatement was made, they both had contemporaneous access to real-time data and trends contradicting the Delinquency Misstatement. Specifically, the Delinquency Misstatement advised investors that delinquency rates "really are following the normal seasonal trends." However, at the time the Delinquency Misstatement was made, by virtue of their membership on the Credit Committee, and ongoing receipt of and access to materials concerning SLM's delinquency rates (including early-warning monitors that flagged delinquency trends that deviated

from expected seasonal norms), both Graham and Witter had contemporaneous access to real-time data and trends showing that: (i) total delinquencies and Early-Stage Delinquencies as a percentage of total loans; and (ii) total delinquencies and Early-Stage Delinquencies as a percentage of loans in full repayment, had all increased well-above historical seasonal norms from June 2025 to July 2025. By virtue of such knowledge and awareness: (i) Graham knew, or was reckless in not knowing, that by making the Delinquency Misstatement, he was misrepresenting material facts about delinquency rates, i.e., a key metric relevant to the financial condition and performance of SLM; and (ii) Witter knew, or was reckless in not knowing, that by failing to correct the Delinquency Misstatement made by Graham, he was allowing Graham to misrepresent material facts about delinquency rates, a key metrics and thus material to investors.

92.   Graham's and Witter's contemporaneous access to real-time delinquency data and trends in July 2025, is corroborated by the statements of CW-1 whose position as administrator of SLM's Boardvantage platform gave CW-1 access to logs with date- and time-stamped entries that provided full visibility into which executives accessed what documents and when, including activity by Graham and Witter. Based on that firsthand knowledge, CW-1 reported that Graham and Witter: (i) appeared on the distribution list for materials circulated in advance of Credit Committee meetings (which materials consistently included delinquency

reports, including data and graphs showing delinquency trends); (ii) regularly attended and participated in the Credit Committee's monthly meetings (where delinquency rates were a prime topic for discussion); and (iii) routinely accessed risk-related materials on the Boardvantage platform that included early-warning indicators that would flag delinquency trends that deviated from expected seasonal norms for prompt discussion by Credit Committee members.

93.    SLM's 2025 Form 10-K further confirms that: (i) "[d]elinquencies are an *important indicator* of the potential future credit performance of [SLM's] loan portfolio;" (ii) management "*focuses on delinquencies as well as the progression of loans from early to late stage delinquency* as a *key metric* in estimating the allowance for credit losses and tailoring its future collections strategies;" (iii) management reviews "delinquency percentages" when determining the adequacy of credit loss allowances, including "delinquencies as a percentage of loans in repayment;" and (iv) "credit risk related to Private Education Loans" is managed *primarily* through the Credit Committee of which Graham and Witter are members via "a credit risk infrastructure that includes . . . ongoing monitoring and review process of portfolio composition and trends [and] . . . establishment of an allowance for credit losses that covers estimated future losses based upon an analysis of portfolio metrics and economic factors."

94.    Additionally, the LinkedIn profile of Mr. Ling confirms that data

41

concerning the performance of SLM's loan portfolio continues to be distributed to upper management via "dynamic" (i.e., real-time) dashboards and analytical packages to enable senior SLM executives like Witter and Graham to identify and monitor risk within SLM's PEL portfolio.

**B.    Graham Spoke Knowledgeably on Conference Calls Regarding Delinquency Rates and Seasonality, Including Responding to Specific Questions From Analysts About Such Rates by Detailing the Factors <u>Influencing Such Rates</u>**

95.    Further evidencing scienter, Graham's statements on earnings calls before the Class Period, and the Q2 2025 Call during the Class Period, implied firsthand knowledge concerning delinquency rates, and the factors influencing those rates such as seasonality. For example, on the Q4 2024 Call, Graham reported that PELs "delinquent 30 day or more were 3.7% of loans [in] repayment as of December 31, 2024, an increase from 3.6% at the end of the third quarter, but a decrease from 3.9% at the end of 2023." Graham then attributed "this slight uptick in delinquencies from the third quarter" as being "primarily driven by *seasonality*, as well as marginally impacted by continued refinements to the eligibility of our loan modification offerings."

96.    Then, on the Q1 2025 Call, Graham reported that "[p]rivate education loans delinquent 30 days or more were 3.6% of loans in repayment, a decrease from 3.7% at the end of 2024, although higher than the 3.4% at the end of the year ago

quarter." Thereafter, during the Q&A session for that call, Graham responded knowledgeably to a question from an analyst concerning an uptick in Early-Stage Delinquencies by detailing factors influencing delinquency rates.

97.     Finally, on the Q2 2025 Call, Graham reported that PELs "delinquent 30 days or more were 3.5% of loans in repayment, a decrease from the 3.6% at the end of the first quarter of 2025, although higher than the 3.3% at the end of the year ago quarter." During the Q&A session for that call, Graham again responded knowledgeably to a question from an analyst concerning an uptick in Early-Stage Delinquencies by detailing factors influencing delinquency rates, including seasonality.

98.     All of the above statements indicate that Graham had firsthand knowledge concerning delinquency rates, and factors influencing those rates such as seasonality. As such, Graham would have been aware that the rise in delinquency rates between June and July 2025, was far above "normal seasonal trends."

C.     **Delinquency Rates Were a Core Metric Carefully Monitored Internally at SLM by the Credit Committee and Externally by SLM Investors**

99.     As discussed in Section D above, SLM estimates an allowance for credit losses every quarter to ensure that it is not overstating the value of its loan assets, and that it has sufficient reserves to cover expected future loan defaults. Accordingly, a key risk affecting SLM's financial condition is credit risk; that is, the

risk that borrowers will default on their student loans.

100.    To estimate the rate at which borrowers will default, one of the core metrics monitored by the Credit Committee is delinquency rates. As explained in the 2025 Form 10-K: "*[d]elinquencies are an important indicator of the potential future credit performance of our loan portfolio*," and therefore management "*focuses on delinquencies as well as the progression of loans from early to late stage delinquency* as a *key metric* in estimating the allowance for credit losses and tailoring its future collections strategies." The 2025 Form 10-K further states that management reviews "delinquency percentages" when determining the adequacy of credit loss allowances with one such percentage reviewed being "delinquencies as a percentage of loans in repayment."

101.    Delinquency rates are also a core metric for investors in SLM's Trusts. As discussed in Section C above, the Data Website publishes delinquency rates for each of the outstanding Trusts on a delayed basis, including "30-59 Day Delinquencies as a % of Loans in P&I Repayment," "60-89 Day Delinquencies as a % of Loans in P&I Repayment," and "90+ Day Delinquencies as a % of Loans in P&I Repayment."

## PRESUMPTION OF RELIANCE

102.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. Such a presumption is appropriate because, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SLM securities are traded in an efficient market;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class invested in SLM securities between the time that the Defendants misrepresented material facts, and the time the true facts were disclosed, without knowledge of such misrepresentation.

103.    At all relevant times, SLM's common stock traded on an efficient market because, among other things:

- As a regulated issuer, SLM filed periodic public reports with the SEC;

- SLM's common shares were highly liquid and traded with moderate to heavy volume during the Class Period;

- SLM common shares traded on the NASDAQ and were covered by multiple analysts; and

- SLM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

45

such as communications with the financial press and other similar reporting services, and held earnings calls attended by multiple analysts following SLM's release of its quarterly results.

104.  Given that SLM common stock traded on an efficient market, the market for SLM options is also efficient given that such options were derivatives of SLM common stock whose value depended on the value of SLM common stock.

105.  Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market price of SLM securities.

106.  Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

107.  At all relevant times, SLM securities traded in an efficient market that promptly digested new information regarding SLM from all reasonably accessible public sources, and reflected such information in the price of SLM securities. As described above, during the Class Period, Graham made a false and misleading statement concerning SLM's delinquency trends in July 2025, which Graham knew, or was reckless in not knowing, misrepresented material facts about delinquency

rates that were key metrics relevant to the financial condition and performance of SLM. Graham's false and misleading statement caused SLM securities to trade at artificially inflated prices during the Class Period and, thus, operated as a fraud or deceit on Plaintiff and other members of the Class who invested such securities before such inflation was removed.

108.   As detailed herein, the price of SLM's common stock (and likewise, the value of derivative securities such as options whose value depended on the value of SLM's common stock) fell sharply on August 15, 2025, on unusually high volume, in response to the corrective disclosures made in the TD Cowen August 14 Report after the close of trading on August 14, 2025. The price of SLM's common stock (and likewise, the value of derivative securities such as options whose value depended on the value of SLM's common stock) fell in response to the TD Cowen August 14 Report because such report revealed information that removed part of the inflation introduced by Graham's previous false and misleading statement, causing real economic loss to Plaintiff and other members of the Class who invested in SLM securities during the Class Period at inflated prices.

109.   The sharp price decline and elevated trading volume on August 15, 2025 reflect the market's collective repricing of SLM securities upon the revelation of the true state of SLM's delinquency trends, negating any inference that the decline

47

was attributable to market-wide conditions, macroeconomic factors, or Company-specific facts unrelated to the Delinquency Misstatement.

110. The decline in the value of SLM securities referenced above was a direct and proximate result of the falsity and misleading nature of Graham's statement being revealed to the market and/or the materialization of risks concealed by such statement. The timing and magnitude of such decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein. Accordingly, Graham's false and misleading statement on July 24, 2025, directly and proximately caused Plaintiff and other members of the Class to suffer economic losses, i.e., damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

111. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who invested in SLM securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures in TD Cowen's August 14 Report. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

112. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SLM securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Indeed, as noted, as per SLM's most recent quarterly report on Form 10-Q, as of March 31, 2026, there were 188,582,790 shares of common stock outstanding. The members of the Class can be identified from records maintained by SLM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected and damaged by Defendants' wrongful conduct in violation of federal securities laws as alleged herein.

114. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

115.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SLM;

- whether Graham caused SLM to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SLM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

116.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Graham and SLM)

117.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

118.  This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

119.  During the Class Period, Graham and SLM disseminated or approved the dissemination of the Delinquency Misstatement, which they knew or recklessly disregarded was false and misleading in that it contained misrepresentations and failed to disclose material facts necessary in order to make the Delinquency Misstatement, in light of the circumstances under which it was made, not misleading. Specifically, Defendants made the false and misleading Delinquency Misstatement to securities analysts during the Q2 2025 Call, which artificially inflated the value of SLM securities. Such statement was materially false and misleading in that it failed to disclose material adverse information concerning SLM's delinquency trends, and thus misrepresented the truth about SLM's financial condition and performance.

120.  The Delinquency Misstatement was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii)

51

artificially inflate and maintain the value of SLM securities; and (iii) cause Plaintiff and other members of the Class to invest in SLM securities and options at artificially inflated prices.

121. By virtue of his position as CFO at SLM, Graham had actual knowledge of the materially false and misleading statement alleged herein, and in making it, intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that he failed to ascertain and disclose such facts as would have revealed the materially false and misleading nature of the statement made, even though such true facts were readily available and accessible to Graham, as more fully alleged above.

122. Information proving that Graham acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

123. Defendants Graham and SLM are liable both directly and indirectly for the wrongs complained of herein. In particular, because of his position of control and authority, Graham was able to and did, directly or indirectly, control the content of SLM's public statements. As SLM's CFO, Graham had a duty to disseminate timely, accurate, and truthful information with respect to SLM's businesses, operations, financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading public statement, the value of SLM securities was artificially inflated during the Class Period. In ignorance of the

52

adverse facts concerning SLM's financial condition and performance concealed by SLM and Graham, Plaintiff and the other members of the Class invested in SLM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and the false and misleading statement disseminated by SLM and Graham, and were damaged thereby.

124.   During the Class Period, SLM securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying upon the integrity of the market, which digested the materially false and misleading statement made and disseminated by Defendants as alleged herein, invested in SLM securities at prices artificially inflated by SLM's and Graham's wrongful conduct.  Throughout the Class Period, the true value of SLM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class as evidenced by the sharp decline in the value of SLM securities upon public disclosure of the true facts alleged herein, which caused harm to Plaintiff and Class members.

125.   By reason of the misconduct alleged herein, SLM and Graham knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

126.   As a direct and proximate result of SLM's and Graham's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective investments in SLM securities during the Class

53

Period, upon the disclosure that Defendant had disseminated false and misleading misrepresentations to the investing public concerning SLM's financial condition and performance.

## COUNT II

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Witter)

127. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

128. This Count is asserted against Witter and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

129. During the Class Period, Witter failed to correct the Delinquency Misstatement made by Graham, even though Witter had authority over Graham, and Witter knew or recklessly disregarded that the Delinquency Misstatement was false and misleading in that it contained misrepresentations and failed to disclose material facts necessary in order to make the Delinquency Misstatement, in light of the circumstances under which it was made, not misleading. Specifically, while Witter was present on the Q2 2025 Call, Graham made the false and misleading Delinquency Misstatement to securities analysts during the Q2 2025 Call, which artificially inflated the value of SLM securities. Such statement was materially false and misleading in that it failed to disclose material adverse information concerning

54

SLM's delinquency trends, and thus misrepresented the truth about SLM's financial condition and performance.

130. Witter knew or recklessly disregarded that the Delinquency Misstatement was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the value of SLM securities; and (iii) cause Plaintiff and other members of the Class to invest in SLM securities and options at artificially inflated prices; and yet he failed to correct it despite having the authority to do so.

131. By virtue of his position as CEO at SLM, Witter had actual knowledge of the materially false and misleading nature of the Delinquency Misstatement, and knew or recklessly disregarded that in making it, Graham intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, had acted with reckless disregard for the truth in that he failed to ascertain and disclose such facts as would have revealed the materially false and misleading nature of the statement made, even though such true facts were readily available and accessible to both Graham and Witter, as more fully alleged above. Yet, Witter failed to correct the Delinquency Misstatement despite having the authority to do so.

132. Information proving that Witter acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

133.   Defendant Witter is liable both directly and indirectly for the wrongs complained of herein.  In particular, because of his position of control and authority, Witter was able to and did, directly or indirectly, control the content of SLM's public statements. As SLM's CEO, Witter had a duty to ensure the dissemination of timely, accurate, and truthful information with respect to SLM's businesses, operations, financial condition and future prospects, by both himself and those SLM employees over whom he had authority by virtue of his position as CEO.  As a result of the dissemination of the aforementioned false and misleading public statement, the value of SLM securities was artificially inflated during the Class Period.  In ignorance of the adverse facts concerning SLM's financial condition and performance concealed by Witter, Plaintiff and the other members of the Class invested in SLM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and the false and misleading statement disseminated as a result of Witter's failure to exercise his authority to correct such statement, and were damaged thereby.

134.   During the Class Period, SLM securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying upon the integrity of the market, which digested the materially false and misleading statement made and disseminated by Defendants as alleged herein, invested in SLM securities at prices artificially inflated by Witter's wrongful conduct.  Had Plaintiff and the

56

other members of the Class known the truth, they would not have invested in said securities, or would not have invested in them at the inflated prices that were paid. At the time of the investments by Plaintiff and the Class, the true value of SLM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The value of SLM securities declined sharply upon public disclosure of the true facts alleged herein to the injury of Plaintiff and Class members.

135. By reason of the misconduct alleged herein, Witter knowingly or recklessly, directly or indirectly, has violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

136. As a direct and proximate result of Witter's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective investments in SLM securities during the Class Period, upon the disclosure that Defendants had disseminated false and misleading misrepresentations to the investing public concerning SLM's financial condition and performance.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants)**

137. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

139. During the Class Period, Defendants engaged in fraudulent acts and participated in a scheme to defraud Plaintiff by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for SLM securities.

140. As set forth herein, Defendants (i) employed devices, scheme, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon SLM investors during the Class Period.

141. Defendants' fraudulent acts in furtherance of the scheme were intended to and did: (a) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (b) artificially inflate SLM securities; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire the SLM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

142.    As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Defendants issued and or failed to correct the Delinquency Misstatement. Specifically, during the Q2 2025 Call, the individual defendants each reported to analysts regarding the Company's results of operations and financial conditions and each answered analyst questions. When analyst Terry Ma asked the Individual Defendants for "color" regarding delinquency rates, Graham responded on behalf of SLM that delinquencies "really are following the normal seasonal trends that we would expect in the business." Graham and Witter each possessed, or at minimum had access to, contemporaneous data contradicting the foregoing Delinquency Misstatement. Nevertheless, Witter failed to correct the Delinquency Misstatement on the Q2 2025 Call.

143.    Indeed, as described above, Defendants acted with scienter throughout the Class Period, in that they affirmatively and knowingly or with reckless disregard participated in the scheme to defraud investors. In addition, Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants engaged in this misconduct to, among other things, conceal from the investing public that delinquencies in July 2025 did not follow normal seasonal trends and to support the artificially inflated prices of SLM's securities.

59

144. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

145. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146. During the Class Period, the Individual Defendants participated in the operation and management of SLM, and conducted and participated, directly and indirectly, in the conduct of SLM's business affairs. Thus, the Individual Defendants knew the truth about the delinquency rates that were the subject of the Delinquency Misstatement.

147. As the CEO and CFO of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SLM's financial condition and performance, and to promptly correct any public statements issued by SLM which had become materially false or misleading.

148. Because of their position of control and authority as SLM's CEO and CFO, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SLM disseminated in the marketplace during the Class Period concerning SLM's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and

60

authority to cause SLM to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of SLM within the meaning of Section 20(a) of the Exchange Act during the Class Period. In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the value of SLM securities.

149. The Individual Defendants, therefore, acted as controlling persons of SLM. By reason of their senior management positions at SLM, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SLM to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of SLM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

150. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SLM.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

61

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the unlawful conduct alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 8, 2026                    Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Brian Calandra
Tamar Weinrib (admitted *pro hac vice*)
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com
taweinrib@pomlaw.com
jalieberman@pomlaw.com

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(admitted *pro hac vice*)
25 Robert Pitt Drive, Suite 209G

62

Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff and Co-Lead Counsel*
*for the Proposed Class*